UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

vs.  Criminal Case No. 21-20159

EDUARDO NAVARRO and
NAYADE VARONA,

        **Defendants.**
_____/

### UNITED STATES' SENTENCING MEMORANDUM

The United States submits this Sentencing Memorandum for defendants Eduardo Navarro and Nayade Varona, who are scheduled to be sentenced on August 11, 2021. For the reasons discussed below, the government recommends that the Court sentence defendant Navarro to a term of imprisonment of 46 months, and sentence defendant Varona to a term of imprisonment of 30 months, each followed by a term of supervised release. The recommended sentences are each at the low end of the applicable Guidelines ranges, are sufficient but not greater than necessary to meet the goals of sentencing, and appropriately account for the factors set forth in 18 U.S.C. § 3553(a).

**I.     Factual and Procedural Background**

Defendants Navarro and Varona participated in a conspiracy to fabricate clinical trial data and defraud the federal Food and Drug Administration ("FDA"), which regulates clinical trials of new drugs. Beginning at least as early as April 2014 and continuing until at least April 2016, defendant Navarro was employed at Tellus Clinical Research, a clinic based in Miami, as a sub-investigator working on clinical trials. As a sub-investigator, Navarro – a licensed nurse practitioner – was responsible for, among other things, performing study-related medical procedures on subjects, conducting physical examinations of subjects, and preparing case histories

1

reflecting the participation of the subjects in the study. Defendant Varona also worked on clinical trials at Tellus as an assistant study coordinator at Tellus from at least June 2014 through at least July 2016. Her responsibilities included, among other things, administering procedures to study subjects and creating written records reflecting the participation of subjects in the study.

Navarro, Varona, and their co-conspirators executed a scheme to unlawfully enrich themselves by fabricating clinical trial data to deceive pharmaceutical company sponsors and the FDA. Instead of doing the work to recruit eligible study subjects and conduct the trials according to the required study protocols, the defendants and their co-conspirators fabricated medical records to make it appear as though subjects purportedly enrolled in clinical trials at Tellus were participating in those trials as required by the applicable study protocols by, among other things, visiting the study site and taking the study drug. In reality, however, Navarro, Varona, and their co-conspirators made countless false entries in study records, documenting procedures and visits that never occurred, patient consent that was never sought or obtained, and dispensation of study drugs that were never dispensed or administered. The defendants and their co-conspirators did all this simply to make more money by defrauding the pharmaceutical company sponsors into making payments to Tellus Clinical Research.

On March 16, 2021, Defendants Navarro and Varona were charged jointly in a one-count Information with conspiracy to defraud the United States and to commit an offense against the United States, in violation of 18 U.S.C. § 371. Dkt. # 1. On June 8, 2021, Navarro and Varona each pleaded guilty, pursuant to the terms of a Rule 11(c)(1)(B) plea agreement. Dkt. # 27, 31.

II.     **Guidelines Calculation**

    A.     <u>Navarro</u>

As set forth in Navarro's plea agreement and as calculated by the Probation Office, the total offense level applicable to Navarro's offense, after acceptance of responsibility, is a level 23.

Dkt. # 27, ¶¶ 9-10; Navarro PSR ¶ 66.  Because Navarro's criminal history category is I, his advisory guidelines range is 46-57 months of incarceration.  The maximum penalty for the crime of conviction, 18 U.S.C. § 371, is 60 months of incarceration.

  B. <u>Varona</u>

As set forth in Varona's plea agreement and as calculated by the Probation Office, the total offense level applicable to Varona's offense, after acceptance of responsibility, is a level 19. Dkt. # 31, ¶¶ 9-10; Varona PSR ¶ 66.  Because Varona's criminal history category is I, her advisory guidelines range is 30-37 months of incarceration. Likewise, the maximum penalty for the crime of conviction, 18 U.S.C. § 371, is 60 months of incarceration.

**III.** **Sentencing Factors**

As the Court is aware, under 18 U.S.C. § 3553(a), the Court is charged with imposing a sentence "sufficient, but not greater than necessary," to meet the purposes of sentencing—that is, to (A) reflect the seriousness of the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training.  In considering the appropriate sentence, the court must consider a number of factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to promote respect for the law.  18 U.S.C. § 3553(a).

  **A. Nature and Circumstances of the Offense and Purposes of the Statutes**

Defendants Navarro and Varona participated in a sophisticated scheme to falsify clinical trial data.  To understand the nature and circumstances of the offense, it is necessary first to consider the system governing drug approval in the United States, and the critical role that clinical trials play in ensuring the integrity of our nation's drug supply.

      **1.**      **The Federal Food, Drug and Cosmetic Act**

The Federal Food, Drug, and Cosmetic Act ("FDCA") broadly regulates drugs at all stages of development, manufacture, and distribution. In particular, the FDCA requires that the Food and Drug Administration ("FDA") approve a drug before it can be lawfully distributed in interstate commerce. *See* 21 U.S.C. § 355(a); 21 U.S.C. § 331(d). To obtain approval, a manufacturer—such as a pharmaceutical company sponsoring a clinical trial—must submit an application to the FDA which demonstrates, to the FDA's satisfaction, that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(b)(1)(A).

The genesis of these approval requirements is steeped in tragedy. First codified in 1938, the FDCA was created in response to the deaths of more than 100 people across the country after a pharmaceutical company sold sulfanilamide in a liquid form, apparently without testing the formulation for toxicity. *See United States v. Premo Pharm. Labs., Inc.*, 511 F. Supp. 958, 962 (D.N.J. 1981); Carol Ballentine, *Sulfanilamide Disaster*, FDA CONSUMER MAGAZINE, June 1981, https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf. In an effort to ensure that such tragedies never occur again, drug manufacturers are generally required to provide the FDA with the "gold standard" of clinical research data—data derived from controlled clinical trials—to demonstrate the safety and effectiveness of a drug intended for commercial distribution. *See* 21 U.S.C. § 355(b)(1)(A); 21 C.F.R. § 314.50(d)(5).

A clinical trial is an experiment in which a drug is dispensed to consenting human subjects. 21 C.F.R. § 312.3(b). The FDCA seeks to ensure that all clinical trials are conducted purposefully, honestly, and safely. Thus, prior to beginning a clinical trial, a sponsor (*i.e.*, a pharmaceutical company that initiates and takes responsibility for a clinical trial) is required to provide the FDA with extensive information about the proposed study, including a detailed investigational plan known as a protocol. 21 C.F.R. § 312.23(a)(6); 21 C.F.R. § 312.50. The protocol describes the

criteria (known as "eligibility criteria") for persons to participate in the study as subjects; drug and dosage regimens; the length of the study; and the outcomes that will be measured by the study. 21 C.F.R. § 312.23(a)(6). Clinical trials must be conducted according to the protocol.

A clinical investigator, typically a physician, is responsible for ensuring that a trial is conducted according to the protocol and applicable FDA regulations. 21 C.F.R. § 312.60. FDA regulations impose a number of requirements on clinical investigators. For example, before beginning a trial, a clinical investigator is required to provide the sponsor with a signed Form FDA 1572, in which the investigator agrees to abide by the terms of the protocol and all applicable FDA regulations. 21 C.F.R. § 312.53(c)(1). Clinical investigators also must "prepare and maintain adequate and accurate case histories that record all observations and other data pertinent to the investigation" on each subject administered an experimental drug. 21 C.F.R. § 312.62(b). The case histories are required to include, among other things, informed consent forms and medical records. *Id.* FDA regulations also require investigators to maintain adequate records concerning the disposition of study drugs, including dates and quantities of drugs dispensed to subjects. 21 C.F.R. § 312.62(a).

Clinical investigators delegate significant responsibilities to other medical staff in the conduct of clinical trials, including sub-investigators and other staff. The sub-investigator, who typically has some medical training, performs critical trial-related procedures, and may make important trial-related decisions. Senior staff members are often referred to as "study coordinators." Though supervised by the clinical investigator, a study coordinator is usually responsible for the day-to-day running of a clinical trial, and typically has duties related to records preparation and management, subject enrollment and participation, drug dispensation, and data reporting.

The work of clinical investigators and study sites is typically monitored in two ways. First, sponsors hire contract research organizations ("CROs") to manage various aspects of a clinical trial, including by monitoring the progress of a clinical trial at a given study site. *See* 21 C.F.R. § 312.52. CRO staff, called clinical research assistants, may conduct in-person visits to the study site to ensure that the subject case histories are complete, and that the study is being conducted in compliance with the protocol and applicable FDA regulations. The clinical research assistants are generally "blinded," which means that, to ensure the integrity of the resultant data by eliminating potential research biases, they cannot interact at all with the study subjects. Accordingly, the CROs must ultimately rely on the representations made by a clinical investigator and study staff to determine whether a site is conducting a clinical trial properly.

The second way clinical trials are monitored is by the FDA. The FDA is authorized to conduct in-person inspections of clinical investigators and their establishments. 21 C.F.R. § 312.68. As with CROs, the FDA relies on case histories and the representations of investigators and site staff when evaluating the integrity of clinical trials. FDA investigators, however, are permitted to interview study subjects to verify qualification for and participation in a given study. *See id.*

### 2.    The Nature and Circumstances of the Offense

Defendants Navarro and Varona worked as a sub-investigator and assistant study coordinator, respectively, at Tellus Clinical Research, a research site that was contracted to conduct more than twenty clinical trials for more than fifteen different pharmaceutical company sponsors between approximately 2013 and 2016. The trials purportedly conducted by Tellus were intended to study a variety of medical conditions, ranging from opioid dependency to diabetic kidney disease.

Among the trials Tellus was contracted to conduct were two trials intended to evaluate the

6

safety and efficacy of a drug intended to treat irritable bowel syndrome with diarrhea (collectively, "the IBS trials"). The clinical trial protocols for the IBS trials required study subjects to do a number of things. For example, study subjects enrolled in the second IBS trial were required to: (1) attend a screening visit at the clinic (in this case, Tellus); (2) visit the clinic a total of thirteen times, and complete study procedures in person; (3) take the study medication as directed; and (4) call daily into an Interactive Voice Response System to record data about their condition.

Dr. Martin Valdes[1] was selected to be one of the clinical investigators for the IBS trials, through Tellus Clinical Research, which represented itself to the sponsor of the IBS trials as a legitimate medical clinic at which clinical trials were performed. Dr. Valdes was aided by a staff at Tellus, including by defendant Navarro, who was the sub-investigator on both IBS trials, and by defendant Varona, who was an assistant study coordinator. Each defendant was delegated a range of specific and significant responsibilities in those trials. As sub-investigator for the IBS trials, Navarro worked under the direction of Dr. Valdes, and was responsible for conducting physical examinations on subjects, reviewing lab work and electrocardiograms (more commonly known as "EKGs"), and preparing case histories reflecting the participation of the subjects in the studies. As assistant study coordinator, Varona's responsibilities were less extensive than Navarro's, but still included administering certain medical procedures to the subjects such as taking their vital signs or drawing their blood, and creating written records reflecting the participation of the subjects in the trials.

Prior to starting at Tellus, both Navarro and Varona had worked in the clinical research field. They were well aware of how clinical trials were supposed to be conducted and of their

---

[1] In February 2021, Valdes was indicted separately, along with three co-defendants, in a related case, *United States v. Valdes et al.*, 21-cr-20106, which is currently pending trial before Judge Scola. Trial against Dr. Valdes and his co-defendants is presently set for January 22, 2022.

obligations as clinical researchers. Both defendants knew that Tellus and Dr. Valdes had been retained to perform the IBS trials—and every other study Tellus was contracted to conduct—honestly and accurately. Both defendants also knew that the FDA regulated clinical trials, and had the authority to inspect Tellus's site and review medical records and other materials concerning those trials.

Despite this, Navarro and Varona did not perform their responsibilities on these clinical trials as required. Instead, to obtain money from pharmaceutical company sponsors and to deceive the FDA, they each made hundreds of misrepresentations on subject charts asserting that they had performed various study procedures required by the applicable study protocols when, in fact, they had not. The defendants and their co-conspirators falsified records to make it appear that study subjects had, among other things, consented to participating in the applicable clinical trial, satisfied the eligibility criteria, appeared for scheduled visits at the Tellus site, taken study drugs as required, and received checks as payment for site visits, when, in truth and in fact, and as the defendants well knew, those things had not happened.

The government's investigation revealed that the conspirators enrolled subjects in various studies, including the IBS trials, who were not actually participating in the studies according to the protocol. Some subjects were enrolled in studies despite not having the medical condition being studied; others appeared to be enrolled on paper but, with the full knowledge of the study staff, did not visit Tellus as required, participate in the Interactive Voice Response System, or take the medication being studied. In some instances, subjects' identification documents were altered by the conspirators to make it appear as though they qualified for the study when, in fact, they did not—for example, by changing a birth date to make it appear as though the subject met the age qualification criteria. Other subjects were enrolled in trials without their knowledge entirely. In

many of those instances, the conspirators used subject names and dates of birth—both means of identification—to create subject ID numbers that they then used to enroll those subjects in clinical trials without their knowledge, consent, or participation.

To make it appear to the sponsors, CROs, and the FDA as though the subjects had fully participated in the studies and the conspirators had fully complied with the study protocols, Navarro, Varona, and their co-conspirators deliberately, artfully, and repeatedly lied about the medical treatment and study participation of the study subjects. They invented official-sounding statements to write in numerous fabricated case histories. They submitted blood samples for testing that they represented were taken from the enrolled study subject when, in actuality, they were taken from the co-conspirators themselves. And they placed false copies of checks in the study records representing that study subjects had been paid for a particular visit required by the protocol when, in fact, the true copy of the check was made out to or deposited by a conspirator. This conduct was neither aberrational nor brief: both defendants worked at Tellus for years, and both knowingly committed fraud, day after day, for years.

Navarro and Varona each represented, on many occasions, that they saw subjects in person and performed medical procedures or examinations when they had not. As Navarro admitted in his factual proffer, he represented in a case history that he saw one particular study subject purportedly enrolled in the second IBS trial, K.L., in person, and performed a physical examination on K.L. as required by the study protocol, including, among other things, examining K.L.'s general appearance, respiratory system, and cardiovascular system. Dkt. # 26 at 3. Defendant Varona initialed the same subject's case history documentation, representing that K.L. was a study subject, that Varona had seen K.L. in person, and that Varona had taken a number of actions required by the study protocol, including talking to K.L. about her dietary habits, lifestyle, and exercise

regimen, collecting K.L.'s urine, taking K.L.'s vital signs, and dispensing the study drug to K.L. Dkt. # 30 at 3. Those representations, made by both Navarro and Varona, were false. In fact, K.L. had never participated in a clinical trial at Tellus and had never heard of Tellus.

Nor did K.L. or many of the other subjects enrolled in the IBS trials call in to the Interactive Voice Response System daily to report their experience with the course of treatment. Instead, the conspirators themselves made the phone calls, using a means of the subjects' identification (their dates of birth) to create another means of identification (unique PIN numbers used to access the subjects' medical record within the phone system), and falsifying the subjects' participation in the study and his or her experience with the investigational drug. The false case histories served to mislead the CRO and FDA in connection with monitoring visits and an FDA inspection, as the fake histories falsely represented that the studies were being conducted in full compliance with the protocol. The defendants' falsification of subject case histories was instrumental to this effort. Indeed, the fraud went on for multiple years before the sponsor of the IBS trials discovered irregular patterns in the reported data from Tellus. And it was not until after the sponsor reported the matter to the FDA, and the FDA commenced its own investigation, that the fraud stopped.

Fraud in the clinical trial context poses a significant risk to the public health. Sponsors initiate clinical trials for the purpose of submitting the resultant data to the FDA, typically in support of applications seeking FDA approval to market new drugs within the United States. The FDA relies on the veracity of clinical trial data to make these determinations, with the ultimate goal of ensuring that all FDA-approved drugs are safe and effective for their approved indications. Clinical trial data is also frequently published in medical journals, where the scientific and medical communities rely on it in furtherance of drug research and patient treatment. Consequently, if a site fabricates data in connection with a study, the FDA, drug researchers, and medical doctors

could end up relying upon that false data when making material decisions about the safety, efficacy, and clinical use of drug products.

As explained by the former CEO of Vascular Pharmaceuticals, Inc., identified in the Information as "Sponsor #2," the mere act of fabricating clinical trial data—even when such fabrication is found out before the data is relied upon in the specific instance—undermines our drug approval system and erodes public confidence in our drug supply.[2] *See* Ex. 1 (impact statement of Richard J. Shea, former CEO of Vascular Pharmaceuticals, Inc.).  The FDA, drug manufacturers, medical doctors, and the public at large must be able to rely on the integrity of drug research without qualification.  Such reliance is a foundation of our healthcare system, as it enables the approval, distribution, and consumption of pharmaceuticals with assurance of their safety and effectiveness.  Offense conduct such as that committed by Navarro and Varona here—amounting to the fabrication of clinical trial data from whole cloth—would effectively replace confidence and assurance in our drug supply with distrust and doubt.

The impact of falsified data ultimately falls on patients—when data that pharmaceutical companies have contracted for and intend to submit to the FDA is fabricated, patients may have to wait longer or be denied medication that could treat their medical condition.  Neither Navarro nor Varona were concerned with the impact of their actions on the FDA, the study subjects purportedly enrolled in the studies, or on the possible and probable consequences of their actions on patients suffering from the medical conditions they were supposed to be studying.  Instead, Navarro and Varona invested their energy into falsifying study records to obtain money from clinical trial sponsors.

---

[2]  The United States attaches the Victim Impact Statement of Vascular Solutions, Inc.  The other victims in this case were all advised of their right to file a victim impact statement.  As of August 4, 2021, no other victim has submitted a victim impact statement.

Consequently, a sentence within the sentencing guidelines range is an appropriate punishment based on the seriousness of each defendant's offense, the importance of maintaining the integrity of clinical trials, and the need to provide just punishment for the offense.

**B. History and Characteristics of the Defendant**

    **1. Navarro**

A sentence of 46 months is also appropriate in light of Navarro's history and characteristics. Quite simply, Navarro should have known better. Navarro is a licensed medical professional, with a long history of medical education and work experience. At the time of the offense, he had a doctoral degree in medicine from a university in Cuba, which was later validated in Venezuela; had studied anesthesiology for four years in Cuba; and had received both a Bachelor's degree and Master of Science degree in nursing in the United States. He was very well-educated and, based on that education and experience, qualified to serve as a person in whom patients placed their trust. Navarro also had prior experience in the clinical research field before he joined Tellus. He understood how clinical trials were supposed to be done. Despite having years of education, training, and experience, Navarro nonetheless willfully participated in the scheme at Tellus. He abused the trust placed in him by the study subjects entrusted to his care, the sponsors of the trials, and the medical community at large.

The government acknowledges that the defendant has accepted responsibility for his actions at the earliest opportunity possible, including by meeting with the government and agreeing to cooperate as soon as he learned of the government's investigation. For that reason, the government recognizes his early acceptance of responsibility by recommending a low-end sentence.

    **2. Varona**

A sentence of 30 months is appropriate in light of Varona's history and characteristics. As

12

with Navarro, defendant Varona had prior experience working in clinical research when she started at Tellus. She knew how clinical research was supposed to be conducted and, despite that, elected to stay at Tellus, make false notations on charts, give her blood to be used in place of study subjects, and accept payments that were intended for and represented to be paid to study subjects. She knew her conduct was wrong, and did it anyway.

Varona has filed a motion for a variance, arguing principally that her family obligations to her ailing mother counsel in favor of a noncustodial sentence. Unfortunately, as the Court is aware, in every case, being held accountable for criminal conduct affects more than the defendant. That said, a custodial sentence is appropriate here to promote respect for the law and to provide general deterrence to others contemplating this offense.

The government recognizes, however, that Varona also accepted responsibility for her actions at the earliest opportunity, including by meeting with the government and agreeing to cooperate as soon as she learned of the government's investigation. For that reason, the government recognizes her early acceptance of responsibility by recommending a low-end sentence.

### C. Need for Deterrence

The offense conduct in this case is serious and dangerous, and it is important to deter others from following their example. Navarro, Varona, and their co-conspirators operated a fraud that could have seriously endangered public health and undermined one of the FDA's most important functions.

All criminal sentences seek to provide general deterrence. But the need for a sentence to advance general deterrence is acute when the offense conduct jeopardizes the population at large, and violates laws intended to protect that population. The conduct by Navarro and Varona did just that. They circumvented federal regulation of clinical trials, and placed healthcare consumers at

risk—all for the motive of personal financial gain.

Consequently, the government submits that a significant sentence for each defendant will serve to protect the community by deterring the defendants specifically, and others generally, from committing offenses that jeopardize the safety of healthcare consumers and undermine the public trust in our country's drug approval system.

## IV. Conclusion

For the reasons stated above, the government recommends a sentence at the low end of the applicable guidelines range—46 months of imprisonment for Navarro, and 30 months of imprisonment for Varona—as sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Dated: August 4, 2021

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

/s/ Lauren M. Elfner
Lauren M. Elfner
Joshua D. Rothman
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch
Court ID Number A5502478; A5502447
450 Fifth Street, NW, Suite 6400S
Washington, D.C.  20001
Tel. 202-305-7171; Fax: 202-514-8742
E-mail: Lauren.Elfner@usdoj.gov
          Joshua.D.Rothman@usdoj.gov